# United States Court of Appeals

**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

———

Argued November 17, 2005          Decided December 23, 2005

No. 04-1388

ENLOE MEDICAL CENTER,
PETITIONER

v.

NATIONAL LABOR RELATIONS BOARD,
RESPONDENT

———

Consolidated with
04-1419

———

On Petition for Review and Cross-Application for
Enforcement of an Order of the National
Labor Relations Board

———

*Laurence R. Arnold* argued the cause for petitioner. With him on the briefs were *John H. Douglas* and *Jennifer B. Hochschild.*

*David S. Habenstreit*, Attorney, National Labor Relations Board, argued the cause for respondent. With him on the brief were *Arthur F. Rosenfeld*, General Counsel, *John H. Ferguson*, Associate General Counsel, *Aileen A. Armstrong*, Deputy

Associate General Counsel, and *Elizabeth A. Heaney*, Attorney. *Joan E. Hoyte-Hayes*, Attorney, entered an appearance.

Before: SENTELLE and ROGERS, *Circuit Judges*, and SILBERMAN, *Senior Circuit Judge*.

Opinion for the Court filed by *Senior Circuit Judge* SILBERMAN.

SILBERMAN, *Senior Circuit Judge*:

The National Labor Relations Board and this court have a fundamental and long-running disagreement as to the appropriate approach with which to determine whether an employer has violated section 8(a)(5) of the National Labor Relations Act when it refuses to bargain with its union over a subject allegedly contained in a collective bargaining agreement. Petitioner Enloe Medical Center claims that it presents a case once again implicating this disagreement, as well as raising some ancillary issues. We agree with Enloe and grant its petition.

I

The California Nurses Association (the Union) has been the certified collective bargaining representative of the registered nurses at Enloe's facilities in Chico, California since September 2000, and Enloe and the Union are parties to a collective bargaining agreement that runs from January 2002 to January 2006. The dispute in this case stems from a change in Enloe's policy for staffing on-call nurses at its Women's Center. Prior to May 2003, on-call staffing was entirely voluntary. At staff meetings in March and April of that year, Jennifer Eddlemon, the clinical coordinator of the Women's Center, announced that Enloe would be adopting a mandatory on-call policy. Starting

in May, each nurse would be required to work one four-hour on-call shift every four weeks, in addition to his or her regular shifts, and nurses would be permitted no more than thirty minutes to report when on call. Eddlemon indicated that if any nurse had a problem complying with the time requirement, that nurse should come to her, and Eddlemon would work out something. Eddlemon also left a message on the white board in the nurses' break room stating that if nurses had any questions about the new policy, they should come speak to her.

In early April, Union representative Kevin Baker learned of the on-call policy change and contacted Pam Sime, Enloe's vice-president of human resources. Baker told Sime that Enloe could not make the proposed change without first negotiating with the Union. Sime replied that Enloe had not done anything yet, but then e-mailed Baker on May 7 advising him that Enloe would be implementing the new policy on May 12. As announced, days later Enloe implemented the new on-call policy.

There is no disagreement between the Board and Enloe that the agreement authorized the adoption of the mandatory on-call policy. The collective bargaining agreement includes provisions spelling out Enloe's rights to  manage the schedules of its employees, compensate nurses for on-call and call-back work, assign duties and hours to nurses, and establish standards related to patient care. It contains a broad "management rights" article, pursuant to which Enloe "retains the sole and exclusive right to exercise all the authority, rights and/or functions of management" and "expressly retains the complete and exclusive authority, right and power to manage its operations and to direct its Nurses except as the terms of [the] [a]greement specifically limit said authority, right and powers." And a separate provision allows Enloe to revise, withdraw, supplement, promulgate, and *implement* policies during the term of the agreement "as it

deems appropriate," provided that such actions do not conflict with the express provisions of the agreement.

Also in 2003, but unrelated to the new on-call policy, Eddlemon made a change in the patient "Rand Card," a written record used by nurses to pass patient information between shifts. In mid-April, nurses Cathe Lawson and Cindy Smith met with Eddlemon to discuss the changes in the card and expressed their dissatisfaction with the new system and their concerns for patient safety.

At an April charge nurses[1] meeting, the charge nurses alerted Eddlemon that some nurses were expressing negative attitudes and were complaining at the nurses' station. They named four nurses, including Smith and Lawson, and Eddlemon decided that she and Peggy Chelgren-Smith, Director of Enloe's Women's Center, would "coach" Smith and Lawson. They called them in separately, and in each meeting Eddlemon read an identical prepared statement. She explained that the nurse's co-workers had complained to her about the nurse's continued griping, negative attitude, and lack of team spirit. Eddlemon stated that she expected the negative behavior to change and asked each how she could help the nurse through the process. Eddlemon also told Smith that if she had future complaints, she should complain directly to Eddlemon. As a result of these conversations, both Smith and Lawson agreed to refrain from their negative behavior.

Based on the imposition of the new on-call policy and the circumstances regarding Smith's and Lawson's complaints, Union representative Baker filed a charge with the Board – on May 5, even before Enloe's May 7 response – alleging

---

[1]Charge nurses are responsible for scheduling, directing, and evaluating the registered nurses.

violations of sections 8(a)(1) and 8(a)(5) of the National Labor Relations Act, 29 U.S.C. § 158(a)(1), (a)(5).[2] The Board, in turn, issued a complaint against Enloe.

After a hearing, the ALJ issued a decision determining that Enloe had violated section 8(a)(5) because, although the agreement authorized petitioner to adopt the new mandatory on-call policy, Enloe was required to bargain with the Union regarding the *effects* of that policy. And the Union had not "waived" its right to bargain over the effects in a "clear and unmistakable" manner. The ALJ also determined that, given this obligation to bargain over effects, Enloe had engaged in unlawful direct dealing with represented employees when Eddlemon instructed nurses who had questions about the new policy or concerns regarding the thirty-minute response time requirement to come to her directly.

The ALJ also concluded that Enloe had violated section 8(a)(1) by interfering with the nurses' protected activity, that is, discussing their grievances with fellow employees. While the ALJ conceded that Eddlemon's statements to Smith and Lawson appeared innocuous on their face, he pointed out that the only specific examples of the nurses' negative attitudes involved their discussions of the Rand Cards and the new on-call policy. This led the ALJ to conclude that the coaching must have been related to Smith and Lawson's protected activity.

A three-member panel of the Board agreed with the ALJ's decision and adopted it with minor modifications.

II

---

[2]Although the collective bargaining agreement contained an arbitration clause, the Union did not invoke that procedure.

The Board's approach to determine whether a union has given up its right to bargain over a mandatory subject of bargaining is to ask whether the union's "waiver" of those rights is "clear and unmistakable." *See, e.g.*, *United Techs. Corp.*, 274 N.L.R.B. 504, 507 (1985). That proposition is not challenged by this court; it falls within the Board's legitimate policy ambit in interpreting the National Labor Relations Act. The difficulty arises when the Board applies this general doctrine to the interpretation of the scope of a collective bargaining agreement. The Board's doctrine imposes an artificially high burden on an employer who claims its authority to engage in an activity is granted by such an agreement. But the normal deference we must afford the Board's policy choices does not apply in this context because the federal judiciary does not defer to the Board's interpretation of a collective bargaining agreement. *See NLRB v. U.S. Postal Serv.*, 8 F.3d 832, 837 (D.C. Cir. 1993); *see also Exxon Chem. Co. v. NLRB*, 386 F.3d 1160, 1164 (D.C. Cir. 2004). This is so because under section 301 of the Labor Management Relations Act, parties to a collective bargaining agreement are entitled to bring a dispute as to the interpretation of the contract directly to a federal district court. *See Litton Fin. Printing Div. v. NLRB*, 501 U.S. 190, 202-03 (1991) (citing *Local Union 1395, International Brotherhood of Electrical Workers v. NLRB*, 797 F.2d 1027, 1030-31 (D.C. Cir. 1986)); *see also BP Amoco Corp. v. NLRB*, 217 F.3d 869, 873 (D.C. Cir. 2000).

We accordingly have held that "questions of 'waiver' normally do not come into play with respect to subjects already covered by a collective bargaining agreement." *U.S. Postal Serv.*, 8 F.3d at 836-37; *see also Regal Cinemas, Inc. v. NLRB*, 317 F.3d 300, 312 (D.C. Cir. 2003). Instead, the proper inquiry is simply whether the subject that is the focus of the dispute is "covered by" the agreement. *U.S. Postal Serv.*, 8 F.3d at 836. The Board refuses to acquiesce in our analysis of this issue – as

it has every right to do – but since any employer faced with a section 8(a)(5) holding predicated on the Board's "clear and unmistakable waiver" doctrine as applied to the interpretation of an agreement can file a petition in this court, *see* 29 U.S.C. § 160(f), the Board's implementation of its policy is stalemated. The Board is, of course, always free to seek certiorari.

In this case, the Board's counsel has sought to convince us that the section 8(a)(5) portion of the Board's order should be affirmed notwithstanding doctrinal differences. The Board acknowledged that petitioner's decision to adopt the mandatory on-call policy was authorized by the collective bargaining agreement; it is only Enloe's refusal to bargain over the *effects* of the new on-call policy that is the gravamen of the Board's section 8(a)(5) finding.

The Board's analysis follows the theory it first announced in *Natomi Hospitals of California, Inc.* (*Good Samaritan Hospital*), 335 N.L.R.B. 901 (2001). There it held that even if a collective bargaining agreement gives an employer the right to make a decision on a particular issue, if the agreement is silent as to the effects of that decision, the employer must agree to bargain with its union over those effects. *Id.* at 902. The Board announced that the union must have "waived" its right to bargain over the effects in the same clear and unmistakable terms it requires for a waiver to bargain over the decision itself. *See id.* The Board developed this approach to contract interpretation by analogy from a case in a different context. In *First National Maintenance Corp. v. NLRB*, 452 U.S. 666, 681-82 (1981), the Supreme Court held that when an employer is authorized by the National Labor Relations Act to make a certain decision without bargaining with its union, it still may be obligated to bargain over the effects of that decision. The Board in *Good Samaritan Hospital* actually suggested that its position followed a fortiori from the principle recognized in *First*

*National Maintenance*, *see* 335 N.L.R.B. at 902, and the ALJ, of course, followed *Good Samaritan Hospital* in this case.

Petitioner contends, although without much analysis, that this analogy does not hold – that the collective bargaining agreement context is different from the statutory one. And, in any event, it argues that its agreement with the Union justifies its refusal to bargain over effects because the agreement authorized Enloe to "implement" its mandatory on-call policy. We agree with petitioner. Whether the parties contemplated that the collective bargaining agreement would treat the effects of a decision separately from the decision itself is just as much a matter of ordinary contract interpretation as is the initial determination of whether the agreement covers the matter altogether. It would be rather unusual, moreover, to interpret a contract as granting an employer the unilateral right to make a particular decision but as reserving a union's right to bargain over the effects of that decision. This is not to say that such an interpretation is inconceivable, but it would seem that there would have to be some language or bargaining history to support the proposition that the parties intended to treat the issues separately. In the *First National Maintenance* situation, the Board is entitled to draw a distinction between a non-bargainable decision and its effects because it is creating the dichotomy itself as an interpretation of the National Labor Relations Act. In the collective bargaining context, however, the question is not whether the Board's policy is consistent with the Act, but rather what is the appropriate interpretation of a contract – i.e., did the parties intend the dichotomy?

The ALJ paradoxically reasoned that since the agreement did not specifically mention effects bargaining, petitioner "cannot rely on the generalized right to promulgate and *implement* new policy to refuse to engage in effects bargaining over the on-call policy." (Emphasis added). He even

distinguished implementation, which he conceded means "putting into effect," from effects bargaining. This sort of artificial contractual interpretation, which we easily reject, is a product of the Board's continued insistence on requiring clear and unmistakable waivers – in this case an ancillary waiver connected to a waiver – of a union's bargaining rights rather than engaging in a straightforward reading of the contract.[3]

The fact that the parties to the collective bargaining agreement in this case never contemplated a dichotomy between the management rights granted Enloe and the effects of those rights is amply demonstrated by the Union's behavior when Enloe announced the new mandatory on-call policy. The Union never identified any particular discrete effect about which it was seeking bargaining. Instead, the May 9 e-mail from Union representative Baker asserted that the contract "[did] not give Enloe the right to unilaterally change [a registered nurse's] working conditions." This suggests that the Union was objecting to the on-call policy change itself, and the concluding sentence of the May 9 e-mail – stating that "Enloe does not have the 'right' to change one's working conditions without first bargaining the impacts with the union" – merges the effects with the policy change. (Indeed, the Union had already filed an unfair labor practices charge on May 5.) Even if a contract distinguished a policy decision from its effects, it would unlikely be interpreted to require the employer to delay the decision while it bargained over effects. *Cf. First Nat'l Maint. Corp.*, 452 U.S. at 681-83.

We therefore conclude that petitioner's actions, including its refusal to bargain with the Union over the effects of its

---

[3]Even without the term "implement," it seems to us that the agreement would not easily be interpreted to reserve to the Union effects bargaining.

mandatory on-call policy change, were sanctioned by its collective bargaining agreement and consequently could not be the basis of a section 8(a)(5) violation.[4]

Since petitioner did not violate section 8(a)(5) when it announced and implemented its new on-call policy without bargaining with the Union, it follows that petitioner did not violate the same provision when Eddlemon told employees to speak with her directly about concerns with the new policy or its thirty-minute response time requirement. If, as we conclude, the collective bargaining agreement gave the employer the right to adopt and implement its new policy without bargaining with the Union, Enloe would perforce have the authority to ameliorate or make individual exceptions to the policy without discussing those ancillary matters with the Union.

### III

There remains the matter of the Board's determination that petitioner violated section 8(a)(1) (interference with protected activity) when it "coached" Smith and Lawson as to their negative attitudes. The ALJ recognized that Eddlemon's statements "appear[ed] innocuous," but he concluded that they "must" have been directed at the Rand Card and on-call policy

---

[4]It might be thought that since we reject the Board's waiver theory, we should stop our analysis and remand to the Board. But this is not the ordinary administrative law case in which we determine that an agency's decision is arbitrary and capricious or contrary to law and remand to the agency to allow it to reconsider its approach. Since we interpret collective bargaining agreements de novo, if we were to agree that – despite doctrinal differences – the agreement *did* reserve to the Union the authority to bargain over effects, it would make little sense to remand. And if, as we conclude here, the agreement did not reserve that right, it also is futile to remand.

issues and "could" have led to discipline. We think that the ALJ's recommended finding on this point is based only on sheer speculation and therefore lacks substantial evidence that the coaching sessions interfered with the employees' protected activity.

\* \* \*

Accordingly, the petition for review is granted, and the cross-petition for enforcement is denied.