# United States Court of Appeals
## For the First Circuit

Nos. 05-2623
     05-2793

BATH MARINE DRAFTSMEN'S ASSOCIATION;
LOCAL LODGES S-6 & S-7, DISTRICT LODGE 4, INTERNATIONAL
ASSOCIATION OF MACHINISTS AND AEROSPACE WORKERS, AFL-CIO,

Petitioners,

v.

NATIONAL LABOR RELATIONS BOARD,

Respondent,

and

BATH IRON WORKS CORPORATION,

Intervenor.

ON PETITIONS FOR REVIEW OF AN ORDER OF
THE NATIONAL LABOR RELATIONS BOARD

Before

Torruella, Lynch, and Lipez,
Circuit Judges.

James B. Coppess, with whom Catherine Fayette, Aaron D.
Krakow, Allison Beck, and Daniel W. Sherrick, were on brief, for
petitioners.
Kira Dellinger Vol, Attorney, National Labor Relations Board,
with whom Fred B. Jacob, Supervisory Attorney, Ronald E. Meisburg,
General Counsel, John E. Higgins, Jr., Deputy General Counsel, John
H. Ferguson, Associate General Counsel, Aileen A. Armstrong, Deputy
Associate General Counsel, were on brief, for respondent.
William J. Kilberg, P.C., with whom Eugene Scalia, William M.
Jay, and Gibson, Dunn & Crutcher LLP, were on brief, for

intervenor.

Charles I. Cohen, with whom Daniel P. Bordoni, and Morgan, Lewis & Bockius, LLP, were on brief, for amicus curiae Council on Labor Law Equality.

---

January 29, 2007

---

**TORRUELLA**, <u>Circuit Judge</u>.  This case arises from an unfair labor practice charge brought by three unions against an employer for unilaterally merging an employee pension plan with that of its parent company.  The National Labor Relations Board (the "Board") dismissed the complaint, finding that the employer had a sound arguable basis for interpreting the employees' contract as granting it the authority to merge the pension plan without the unions' consent.  After careful consideration, we affirm the Board's order.

I.

## A. The Parties

Bath Iron Works Corporation ("the Company") builds surface warships for the United States Navy.  Three unions have long represented the Company's employees covered under the relevant pension plan: Local Lodge S-6 ("S-6") of the International Association of Machinists and Aerospace Workers ("IAM"), Local Lodge S-7 ("S-7") of the IAM, and the Bath Marine Draftsmen's Association ("BMDA," collectively "the Unions").

## B. The Pension Plan

The Company established the Bath Iron Workers Pension Plan for Hourly Employees (the "Plan") in 1963.  The Plan is governed by the Employee Retirement Income Security Act of 1974 ("ERISA").  Article XII of the Plan addresses amendment,

termination, and merger.[1]  Article 12.1 provides that "[s]ubject to the applicable provisions of any collective bargaining agreement, the Company shall have the right to amend, modify, or suspend the Plan."  Under Article 12.2, the Company "reserves the right to terminate the Plan."  Article 12.5 governs the transfer of Plan assets in the case of merger or consolidation, but does not mention who has the authority to merge the Plan.[2]

New benefits stopped accruing under the Plan for S-6 and S-7 members on August 31, 1994, when those employees switched to an IAM multiemployer pension plan.  Nonetheless, S-6 and S-7 Plan participants are still eligible for certain benefits under the Plan based on their prior participation.

## C. The Collective Bargaining Agreements

During the relevant time period, March 1998 to March 2001, each union had a collective bargaining agreement ("CBA") with the Company. The CBAs between the Company and S-6 and S-7

---

[1]  The Company unilaterally amended Articles 12.1 and 12.2 on September 13, 1995.  The Board noted in its decision below that it did not need to choose between the original and new versions because both allow the Company to modify the Plan. Bath Iron Works Corp., 345 N.L.R.B. No. 33, at 2 n.2 (Aug. 27, 2005).  We will cite to the original Plan, as did the parties in their briefs.

[2]  Article 12.5 provides: "In the case of any merger or consolidation of the Plan with . . . any other plan of deferred compensation . . ., the assets of the Plan applicable to such Participants shall be transferred to the other plan only if each Participant in the Plan would . . . receive a benefit immediately after the merger, consolidation, or transfer which is equal to or greater than the benefit he would have been entitled to receive immediately before the merger, consolidation, or transfer . . . ."

respectively both briefly refer to the Plan. Both CBAs also provide that the language therein represents only highlights of the Company's benefits program, as the terms and conditions of specific benefits are governed by separate plan documents.[3] BMDA's CBA discusses the Plan at greater length, providing that the Plan "shall remain in full force and effect in accordance with the provisions thereof."

## D. The Plan Merger

General Dynamics Corporation acquired the Company in 1995. During its 1998 negotiations with BMDA, the Company announced that it was considering a merger of the Plan, which was underfunded, into the General Dynamics Pension Plan. BMDA requested bargaining over the merger of the pension plans, but the Company took the position that the merger was too speculative to warrant negotiations. Shortly after concluding contract negotiations with BMDA, the Company received permission from General Dynamics and the government to merge the plans. The Company then discussed the merger with the Unions, but did not gain

---

[3] The S-6 CBA states: "Your Benefits Program consists of Plans that provide you financial security . . . . These Plans are ERISA Plans and their terms and conditions are governed by Plan Documents . . . ." The S-7 CBA states: "The language contained in this Agreement is intended to represent only highlights of the BIW Employee Benefits Program. All of the terms and conditions in their entirety are governed by Plan Documents and summarized in a Summary Plan Description."

their consent.  Finally, in October 1998, the Company unilaterally merged the Plan into the General Dynamics Pension Plan.

**E. Prior Proceedings**

On October 7, 1998, S-6 and S-7 filed unfair labor practice charges against the Company based on its merger of the Plan, and BMDA followed with its charge on November 27, 1998.  A consolidated complaint was issued on July 29, 1999.

The Administrative Law Judge ("ALJ") found that the merger of the Plan violated Sections 8(a)(1) and (5) and 8(d) of the National Labor Relations Act ("NLRA") by materially, substantially, and significantly modifying the terms and conditions of employment of the represented employees.  The ALJ also determined that the Unions had not clearly and unmistakably relinquished their right to bargain over the merger.

The Board reversed the ALJ and dismissed the complaint on the ground that the ALJ had applied the incorrect standard in the case.  Bath Iron Works Corp., 345 N.L.R.B. No. 33 (Aug. 27, 2005). While acknowledging that the "clear and unmistakable waiver" standard applies in an 8(a)(5) unilateral change case, the Board concluded that "the General Counsel's sole allegation is the allegation of unlawful modification of the contracts within the meaning of Section 8(d)."  Id. at 3.  In such contract modification cases, the Board stated, "the issue is whether the [Company] had a sound arguable basis for its actions."  Id. at 5.  The Board went

-6-

on to determine that the Company did have a sound arguable basis for its interpretation that the CBA and the Plan documents allowed the merger. Id. The Board declined to rule on whether the Company's interpretation of the contracts was correct, leaving such determinations to arbitrators and the courts. Id.

BMDA petitioned for review of the Board's decision on or about October 24, 2005, and S-6 and S-7 followed on December 1. The Company moved to intervene on December 21. The cases were consolidated into this appeal on December 23.

The Unions appeal the Board's dismissal on two grounds: First, the Unions argue that the Board incorrectly applied the "sound arguable basis" standard rather than the "clear and unmistakable waiver" standard. Second, they contend that even if the Board applied the correct standard, it erred in finding that the CBAs arguably granted the Company the authority to unilaterally merge the Plan. We address each of the Unions' arguments in turn.[4]

## II.

### A. Statutory Provisions

Sections 8(a)(5) and 8(d) define an employer's obligation to bargain collectively with its employees' representatives regarding "wages, hours, and other terms and conditions of employment." 29 U.S.C. § 158(a)(5), (d). An employer generally

---

[4] We acknowledge the able assistance provided by the briefs, including those filed by the intervenor and amicus curiae.

may not institute changes with respect to these mandatory subjects of collective bargaining until the parties reach a good faith impasse in bargaining. Litton Fin. Printing Div. v. NLRB, 501 U.S. 190, 198 (1991) (citing NLRB v. Katz, 369 U.S. 736 (1962)). A union may, however, agree to waive its statutory rights and allow the employer to make changes with respect to a mandatory subject without further bargaining. See Metro. Edison Co. v. NLRB, 460 U.S. 693, 705 (1983) ("This Court long has recognized that a union may waive a member's statutorily protected rights . . . ."); NLRB v. C & C Plywood, 385 U.S. 421, 564 (1967) (discussing the Board's power to determine whether a union agreed to give up statutory safeguards).

In order to stabilize collective bargaining agreements, the 1947 revision of the NLRA, the Labor Management Relations Act (LMRA), enacted both the "provisions in §§ 8(d) and 301(a) to prohibit unilateral mid-term modifications and terminations of CBAs and to confer federal jurisdiction over suits for contract violations." Allied Chem. & Alkali Workers v. Pittsburgh Plate Glass Co., 404 U.S. 157, 186 (1971).

Section 8(d) provides in pertinent part:

> [W]here there is in effect a collective-bargaining contract covering employees in an industry affecting commerce, the duty to bargain collectively shall also mean that no party to such contract shall terminate or modify such contract, unless [certain requirements are met].

> . . . [These requirements] shall not be construed as requiring either party to discuss or agree to any modification of the terms and conditions contained in a contract for a fixed period, if such modification is to become effective before such terms and conditions can be reopened under the provisions of the contract.

29 U.S.C. § 158(d). In enacting § 8(d), "Congress intended . . . , at least in part, to overturn earlier [rulings] that even issues squarely covered in a written labor contract were subject to continuing renegotiation during the life of the contract." Gorman & Finkin, Basic Text on Labor Law 625 (2d ed. 2004). From the start, Board members have approached the interpretation of the section with different philosophies. See id. at 624-27 (describing divisions among Board members evidenced in Jacobs Mfg. Co., 94 N.L.R.B. 1214 (1951), enforced, 196 F.2d 680 (2d Cir. 1952)).

The role played by the Board in § 8(d) cases is limited. The section applies only to mandatory, not permissive, subjects of bargaining. Allied Chem., 404 U.S. at 184. It is meant to prevent one party from engaging in economic warfare during the term of the contract by disrupting the economic relationship. Id. at 187. The Board's role is to prevent such economic warfare by prohibiting as unfair labor practices clear mid-term modifications of a contract that disrupt the economic relationship. In such situations, the Board may award remedies including a cease and desist order (effectively, an order to adhere to the contract); an order for an employer to compensate employees for unlawfully reduced wages,

benefits, or bonuses; or an order stripping employees who unlawfully strike of their status as employees, thereby "subject[ing] them to immediate discharge and jeopardiz[ing] forthwith the union's status as bargaining representative." Gorman & Finkin, supra, at 570.

It is clear that § 8(d) is not meant to confer on the Board broad powers to interpret CBAs. In enacting § 301, Congress determined "that the Board should not have general jurisdiction over all alleged violations of collective bargaining agreements and that such matters should be placed within the jurisdiction of the courts." C & C Plywood, 385 U.S. at 427 (footnote omitted). To do otherwise "would have been a step toward governmental regulation of the terms of those agreements," rather than addressing the mechanisms by which such agreements could be reached. Id. Thus, § 8(d) is commonly understood as being constrained by § 301.

In turn, § 301(a) gives the courts, not the Board, jurisdiction over certain disputes, providing:

> Suits for violation of contracts between an employer and a labor organization representing employees in an industry affecting commerce as defined in this Act, or between any such labor organizations, may be brought in any district court of the United States having jurisdiction of the parties . . . .

29 U.S.C. § 185(a). The section was intended to ensure that variations in state law of contract and procedure did not frustrate judicial enforcement of collective bargaining agreements. Gorman

& Finkin, supra, at 736. To that end, § 301(a) conferred federal court jurisdiction over suits for breach of collective bargaining agreements. In the event of such a breach, federal courts may award damages, and in some cases they may award equitable relief (essentially an order to comply with the contract). See Boys Mkts., Inc. v. Retail Clerks Union, 398 U.S. 235, 248, 253-55 (1970) (noting the availability of an action for damages, holding that injunctive relief is appropriate in some § 301 cases despite the anti-injunction provisions of the Norris-LaGuardia Act, and directing that such relief be awarded).

Under C & C Plywood, the Board does have some authority to construe collective bargaining agreements when raised by the employer as a defense to an unfair labor practice charge. 385 U.S. at 428. But in Litton, the Supreme Court stressed that

> [a]lthough the Board has occasion to interpret collective-bargaining agreements in the context of unfair labor practice adjudication, the Board is neither the sole nor the primary source of authority in such matters. "Arbitrators and courts are still the principal sources of contract interpretation." Section 301 of the [LMRA] "authorizes federal courts to fashion a body of federal law for the enforcement of . . . collective bargaining agreements."

501 U.S. at 202 (omission in original) (citations omitted) (quoting NLRB v. Strong, 393 U.S. 357, 360-361 (1969); Textile Workers v. Lincoln Mills of Ala., 353 U.S. 448, 451 (1957) (emphasis added)).

-11-

**B. Standards of Review**

The duty to bargain thus encompasses both those cases in which the employer unilaterally seeks to change the terms and conditions of employment without bargaining and those cases in which the employer unilaterally seeks to modify the terms and conditions of a contract already in place. The Board generally refers to a unilateral change case as a § 8(a)(5) violation and a contract modification case as a § 8(d) violation, notwithstanding that the latter is technically also a § 8(a)(5) violation. Compare NLRB v. Katz, 369 U.S. 736, 736 (1962) (unilateral change), with NLRB v. Bildisco & Bildisco, 465 U.S. 513, 532-33 (1984) (contract modification).

In § 8(a)(5) unilateral change cases, the Board generally applies the "clear and unmistakable waiver" standard, under which the Board determines whether the union has clearly and unmistakably relinquished its statutory rights to bargain over the mandatory subject at issue. See, e.g., Trojan Yacht, 319 N.L.R.B. 741, 742 (1995).

In contrast, the Board applies the "sound arguable basis" standard in § 8(d) contract modification cases. The Board will not find an unfair labor practice if (1) the employer's interpretation of its contractual rights has a sound arguable basis in the contract and (2) the employer was not motivated by union animus, acting in bad faith, or in any way seeking to undermine the union's

-12-

status as a collective bargaining representative.[5]  See, e.g., Westinghouse Elec. Corp., 313 N.L.R.B. 452, 452 (1993), enforced mem. sub nom. Salaried Employees Ass'n v. NLRB, 46 F.3d 1126 (4th Cir. 1995).

The Board articulated the reasons for the sound arguable basis standard in Vickers, Inc., stating:

> The Board is not the proper forum for parties seeking an interpretation of their collective-bargaining agreement.  Where, as here, an employer has a sound arguable basis for ascribing a particular meaning to his contract and his action is in accordance with the terms of the contract as he construes it, and there is "no showing that the employer in interpreting the contract as he did, was motivated by union animus or was acting in bad faith," the Board ordinarily will not exercise its jurisdiction to resolve a dispute between the parties as to whether the employer's interpretation was correct.

153 N.L.R.B. 561, 570 (1965) (footnotes omitted).

The standard applicable in a given case is often very clear, depending, as described above, upon whether the union alleges a unilateral change without bargaining to impasse or a modification in violation of an existing contract without union consent.  However, the choice of analytical framework is not as straightforward when the union alleges a § 8(a)(5) unilateral change and the employer defends with a claim of contractual

---

[5]  In addition, the Board will not find a § 8(d) contract modification violation unless it first "identif[ies] a specific term 'contained in' the contract that the [employer's action] modified." Milwaukee Spring Div., 268 N.L.R.B. at 602.

-13-

privilege to act unilaterally. Traditionally, the Board applies the clear and unmistakable waiver standard, reviewing the contract to determine whether the union clearly and unmistakably waived its statutory right to bargain with respect to a particular action. Bath Iron Works Corp., 345 N.L.R.B. No. 33, at 3; see also Trojan Yacht, 319 N.L.R.B. at 742; Enloe Med. Ctr., 343 N.L.R.B. No. 61 (Oct. 29, 2004), enforcement denied, Enloe Med. Ctr. v. NLRB, 433 F.3d 834 (D.C. Cir. 2005); Amoco Chem. Co. & Oil, 328 N.L.R.B. 1220 (1999), enforcement denied, BP Amoco Corp. v. NLRB, 217 F.3d 869, 873 (D.C. Cir. 2000); U.S. Postal Serv., 306 N.L.R.B. 640 (1992), enforcement denied, NLRB v. U.S. Postal Serv., 8 F.3d 832 (D.C. Cir. 1993).

At times, however, the Board has determined, without much explanation, that the dispute was solely one of contract interpretation and that it was "not compelled to endorse either of the[] two equally plausible interpretations." NCR Corp., 271 N.L.R.B. 1212, 1213 (1984) (quoting Vickers, Inc., 153 N.L.R.B. at 570);[6] see also Bath Iron Works Corp., 345 N.L.R.B. No. 33, at 8 (Liebman, Member, dissenting). Instead, in these cases, the Board applied the sound arguable basis standard and declined to "enter the dispute to serve the function of arbitrator in determining

---

[6] The concurring opinion states that NCR Corp., the principal case in its line, is a § 8(d) contract modification case. We read the case differently, as one in which the union alleged a unilateral change without bargaining to impasse, and the employer defended with a claim of contractual privilege.

-14-

which party's interpretation is correct." NCR Corp., 271 N.L.R.B. at 1213.

To further complicate the issue, the Board has a "fundamental and long-running disagreement" with the District of Columbia Circuit over the appropriate standard in § 8(a)(5) cases in which the employer claims a contractual right to act unilaterally. Enloe Med. Ctr., 433 F.3d at 835. While acknowledging the Board's prerogative to apply the clear and unmistakable waiver standard in these cases, the D.C. Circuit asserts that it owes no deference to the Board's choice of standard when the unfair labor practice turns solely on the interpretation of a labor contract. Id. at 837-38 ("[T]he normal deference we must afford the Board's policy choices does not apply in this context because the federal judiciary does not defer to the Board's interpretation of a [CBA]."). Rather, if the contract covers the subject matter of the dispute, the D.C. Circuit will construe the contract de novo to resolve the unfair labor practice charge, consistent with its authority under § 301(a). U.S. Postal Serv., 8 F.3d at 837 ("Because the courts are charged with developing a uniform federal law of labor contracts under section 301 . . ., we accord no deference to the Board's interpretation of labor contracts."); accord BP Amoco Corp., 217 F.3d at 873.

The D.C. Circuit explains its "contractual coverage" approach in NLRB v. United States Postal Service:

> When employer and union bargain about a
> subject and memorialize that bargain in a
> [CBA], they create a set of rules governing
> their future relations. Unless the parties
> agree otherwise, there is no continuous duty
> to bargain during the term of an agreement
> with respect to a matter covered by the
> contract.

8 F.3d 832, 836 (D.C. Cir. 1993). Thus, once a subject is "covered by" a CBA, any dispute regarding that subject is an issue of contract interpretation, and the question of whether a union has waived its right to bargain over the subject does not come into play. Id. at 836-37. In summary, the District of Columbia Circuit considers "the 'covered by' and 'waiver' inquiries . . . analytically distinct: A waiver occurs when a union knowingly and voluntarily relinquishes its right to bargain about a matter; but where the matter is covered by the [CBA], the union has exercised its bargaining right and the question of waiver is irrelevant." Id.

**III.**

In the case before us, the Board avoided the controversy surrounding the applicable standard when a union alleges a § 8(a)(5) unilateral change and the employer defends with contractual privilege by determining sua sponte that the General Counsel alleged only a § 8(d) contract modification. Bath Iron Works Corp., 345 N.L.R.B. No. 33, at 3. The Unions argue that the General Counsel alleged both a § 8(d) contract modification and a § 8(a)(5) unilateral change, and that the Board therefore erred in

-16-

failing to apply the clear and unmistakable waiver standard to their unilateral change claim. Alternatively, the Unions argue that the sound arguable basis standard incorporates the clear and unmistakable waiver standard.

## A. The General Counsel's Allegations

As a preliminary matter, the Board contends that the Unions are barred under Section 10(e) of the NLRA, 29 U.S.C. § 160(e), from arguing that the General Counsel alleged a § 8(a)(5) unilateral change violation because the Unions did not move for reconsideration of the Board's sua sponte holding.[7] See Woelke & Romero Framing, Inc. v. NLRB, 456 U.S. 645, 665-66 (1982) (holding that the Court of Appeals lacked jurisdiction to consider whether the Board had erred in finding that certain picketing was lawful because no party had raised the issue to the Board, either during the initial proceedings or on motion for reconsideration); Int'l Ladies' Garment Workers' Union v. Quality Mfg. Co., 420 U.S. 276, 281 n.3 (1975) (holding that the Court did not have jurisdiction to consider an argument not presented to the Board in a motion for reconsideration). Section 10(e) does not, however, "deprive the court of jurisdiction if the Union gave the Board 'adequate notice'

---

[7]  In addition, amicus curiae Council on Labor Law Equality supplements that argument by arguing waiver under 29 C.F.R. § 102.46(g) because no exception to the ALJ's treatment of the case as involving a § 8(d) claim was ever filed by the General Counsel. We note the General Counsel was the prevailing party before the ALJ, and it was the Company that filed the exceptions.

of the argument it seeks to advance on review." Am. Postal Workers Union v. NLRB, 370 F.3d 25, 28 (D.C. Cir. 2004); see also NLRB v. St. Regis Paper Co., 674 F.2d 104, 108 n.4 (1st Cir. 1982) (refusing to hear an argument that was not presented to the Board "either initially or via a motion for reconsideration").

It is unfair to say that the Board did not have adequate notice of the Unions' position that the General Counsel raised a § 8(a)(5) unilateral change claim. The General Counsel's brief to the Board argued the unilateral change claim, the Company's failure to bargain to impasse, and the Unions' lack of waiver of its statutory right to bargain. According to the Board's own discussion below, these arguments are relevant only to § 8(a)(5) claims, and not to § 8(d) contract modification claims. Bath Iron Works Corp., 345 N.L.R.B. No. 33, at 3 ("The 'unilateral change' case and the 'contract modification' case are fundamentally different . . . . The allegation [in a 'unilateral change' case] is a failure to bargain. . . . [A] defense to a unilateral change can be that the union has waived its right to bargain."). It seems clear, then, that the Board had adequate notice that the General Counsel and the Unions believed that the § 8(a)(5) unilateral change issue was before the Board, and therefore the issue was preserved for appeal.

Although the General Counsel's Consolidated Complaint could have been clearer, it does in fact allege both a § 8(a)(5)

unilateral change violation and a § 8(d) contract modification violation.  The Complaint alleges that the Company "engaged in the conduct described . . . without [the Unions'] consent."  In the next subparagraph, the Complaint alternatively alleges that the Company "engaged in the conduct described . . . without affording [the Unions] an opportunity to bargain with respect to this conduct and the effects of this conduct."  Again, as the Board explained below, consent is only relevant to a § 8(d) violation, and bargaining is only relevant to a § 8(a)(5) violation.  Thus, the former allegation describes a § 8(d) contract modification without the Unions' consent, whereas the latter alternative allegation describes a § 8(a)(5) unilateral change without bargaining with the Unions.

## B. Appropriate Standard in a § 8(a)(5) Claim with a Contractual Defense

The Unions argue that the clear and unmistakable waiver standard applies to § 8(a)(5) unilateral change claims, regardless of the employer's defense.  The Board below agreed that the clear and unmistakable waiver standard is appropriate to § 8(a)(5) allegations.  When the employer responds to the unilateral change allegation with a claim of contractual right to act unilaterally, however, the Board has not been consistent in its choice of standard, as explained above.  In such cases, the Board is not entitled to the normal deference we owe it.  See Local 777, Democratic Union Org. Comm. v. NLRB, 603 F.2d 862, 871-72 (D.C.

Cir. 1978) ("The vacillation of the NLRB vitiates the deference we would otherwise show to its very considerable expertise in strictly labor matters."); see also Wilcox v. Ives, 864 F.2d 915, 924-25 (1st Cir. 1988) ("The[] general admonitions for judicial review of agency decisions are even more exacting when the courts are faced with inconsistent agency positions . . . .").

Rather, we adopt the District of Columbia Circuit's contract coverage test to determine whether the Unions have already exercised their right to bargain. See U.S. Postal Serv., 8 F.3d at 836. If so, the waiver standard is meaningless. See id. at 836-37. The unfair labor practice determination depends solely on the interpretation of the contract in place, and the appropriate standard for the Board to apply is the sound arguable basis standard. See NCR Corp., 271 N.L.R.B. at 1213. The Board has only limited authority to interpret labor contracts and should not act as an arbitrator in contract interpretation disputes. See id.

This framework is consistent with the NLRA and the NCR Corp. line of Board cases. It preserves for the courts and arbitrators the authority to interpret labor contracts, while permitting the Board to find an unfair labor practice when the employer has not fulfilled its duty to bargain.

Moreover, this approach unifies the Board's disparate approaches to § 8(d) contract modification claims and to § 8(a)(5) unilateral change claims to which the employer has a legitimate

-20-

contractual defense. Unions can and do allege both, as here, and the unfair labor practice determination in both rests on an interpretation of the contract. Yet, the Board traditionally applies vastly different standards to the two identical situations. Further, the Board has not clearly articulated a test for distinguishing between the two claims -- and therefore the two applicable standards -- when both are alleged. C.f., e.g., St. Vincent Hosp., 320 N.L.R.B. 42 (1995) (affirming the ALJ's § 8(d) determination and thus finding it unnecessary to reach the ALJ's alternative § 8(a)(5) determination).

In determining whether a subject is covered by a CBA, such that the sound arguable basis standard is appropriate, we will consider whether the parties bargained over the mandatory subject at issue. The Board has determined that the identity of an ERISA plan sponsor is a mandatory subject of bargaining. Carrier Corp., 319 N.L.R.B. 184, 196 (1995). It is apparent from the language of the CBAs that the parties bargained over the identity of the Plan sponsor, and thus that the CBAs cover the subject. All three CBAs explicitly identify the Plan, and the General Counsel admitted in his brief to the Board that "the identity of the pension plan was a part of the collective bargaining agreement." Furthermore, although it is unclear whether the CBAs authorize a unilateral change in the identity of the Plan sponsor, such as occurred when

the Company merged the Plan, these issues can only be resolved by interpreting the contract.

Because the CBAs cover the subject matter of the present dispute, the sound arguable basis standard applies. Thus the Board did not err below by failing to apply the clear and unmistakable waiver standard.

## C. Appropriate Standard in a § 8(d) Contract Modification Claim

The Unions also argue that the Board applied the wrong standard in analyzing the case as a § 8(d) contract modification violation. They argue that because the Company defended on the basis of a contractual provision, the Board should have required the Company to show a clear and unmistakable waiver of the Unions' right to bargain. The Unions make this argument by analogizing to certain § 8(a)(5) unilateral change cases in which the employer defended on the basis of a management rights clause in a CBA. They argue that even if the sound arguable basis test does apply in § 8(d) cases, "where [a contractual defense] rests on an alleged waiver, the 'sound arguable basis' analysis incorporates the 'clear and unmistakable waiver' standard." We disagree.

As discussed above, the Board has traditionally chosen to use different tests when ruling on § 8(a)(5) unilateral change claims and § 8(d) contract modification claims. Even when the Board determines that a § 8(a)(5) unfair labor practice charge turns solely on the interpretation of a contract, it applies the

-22-

sound arguable basis standard to the exclusion of the clear and unmistakable waiver standard. To our knowledge, the Board has never required the showing of a clear and unmistakable waiver of the union's right to bargain in order to establish a sound arguable basis for the employer's interpretation of a contract. As explained at length above, the two standards are analytically distinct. NLRB v. U.S. Postal Serv., 8 F.3d 832, 836 (D.C. Cir. 1993). Thus, the Unions are incorrect to suggest that the sound arguable basis standard incorporates to any extent the clear and unmistakable waiver standard.

**IV.**

Finally, the Unions argue that the Board erred in holding that the Plan documents were even arguably incorporated into the S-6 and S-7 CBAs,[8] and that the BMDA CBA cannot reasonably be read to grant the Company the authority to alter the Plan sponsor.

**A. The Relationship of the Plan Documents to the S-6 and S-7 CBAs**

In response to the General Counsel's unfair labor practice charges, the Company stated that in merging the Plan into the General Dynamics pension plan it acted pursuant to authority granted it in the Plan documents, which it said were incorporated into the three Unions' CBAs. The Board, in applying the sound arguable basis test, did not hold that the Plan documents were

---

[8] The Unions concede that the CBA with the BMDA arguably incorporates the Plan documents.

-23-

incorporated into the CBAs. It merely held that the Plan documents "are arguably a part of the CBAs," and that "they arguably give the [Company] the authority to effect the merger." Bath Iron Works Corp., 345 N.L.R.B. No. 33, at 5.

The determination of an unfair labor practice charge may become more difficult when certain terms and conditions of employment, such as the specific terms of the Plan, are described in documents other than the CBA itself. Of course, if the CBA expressly states that those other documents are "incorporated in the agreement," that suffices to include those documents in the analysis. Mary Thompson Hosp., 296 N.L.R.B. 1245, 1246-47 (1989), enforced, 943 F.2d 741 (7th Cir. 1991).

We agree with the Board majority, however, that, at least under the sound arguable basis standard, the ALJ and the dissent from the Board's opinion were incorrect to insist on some particular incantation of words.[9] See Bath Iron Works Corp., 345 N.L.R.B. No. 33, at 5. The fact that none of the contracts here use the term "incorporate" does not mean the Plan documents are not sufficiently part of the contracts to be considered in the sound arguable basis analysis. To the extent the Board seems to have adopted a test that the agreements must simply "refer[] in some way

_____

[9] We express no opinion about what might be required under the clear and unmistakable waiver standard.

-24-

to the Plan documents," id. at 2, we disagree. Mere reference may well not be sufficient.

Here, we are persuaded that the Plan documents are sufficiently a part of the S-6 and S-7 CBAs, whether they are explicitly incorporated or not, to be considered in the sound arguable basis test. We examine de novo the terms of the particular agreements, since this is a matter of contract interpretation. See Litton, 501 U.S. at 202. Neither the S-6 nor the S-7 CBA merely refers to the Plan documents. Rather than mere reference, the S-6 CBA specifies that employee pension plans "are ERISA Plans and their terms and conditions are governed by Plan Documents." Similarly, the S-7 CBA states with respect to the Plan, among other benefits, that "[a]ll of the terms and conditions in their entirety are governed by Plan documents . . . ." This language demonstrates that the parties negotiated over and reached a bargain as to what documents governed the terms and conditions of the Plan, and those documents were specifically identified in each of the CBAs. The Company could thus arguably consider the Plan documents a part of the CBA and rely on the documents as a basis for authority to merge the Plan.

## B. The Company's Interpretation of the S-6 and S-7 CBAs

We review de novo the question of whether the Company's interpretation of the three CBAs has a sound arguable basis.

<u>Litton</u>, 501 U.S. at 202.  We conclude that the sound arguable basis test has been met.

To the extent the Unions argue[10] that the Plan documents cannot arguably be read in conjunction with the S-6 and S-7 CBAs to give the Company the authority to alter the Plan sponsor, the Unions still cannot prevail.

The argument that the S-6 and S-7 agreements must be read "to fix the 'terms and conditions' of the pension plan for the duration of the agreement[s]," <u>Bath Iron Works Corp.</u>, 345 N.L.R.B. No. 33, at 11 (Liebman, Member, dissenting), fails.  To the contrary, section 12.1 of the Plan reserves to the Company the right to "amend, modify, or suspend the Plan," subject to any limitations in the CBAs, of which there are none.  The S-6 and S-7 CBAs otherwise explicitly do not exclude that power.  It is a sound and arguable interpretation of those CBAs that the Company had the authority to unilaterally change the Plan sponsor, whether or not the argument is correct.  The dissenting Board Member's point that such an interpretation would give the Unions "less protection against unilateral changes than [they] would have enjoyed if the agreement[s] had never referred to the [P]lan," <u>id.</u> (emphasis

---

[10]  It is not at all clear that they do.  <u>See</u> <u>United States</u> v. <u>Zannino</u>, 895 F.2d 1, 17 (1st Cir. 1990) ("[I]ssues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived.").

omitted), is hardly dispositive. Parties routinely make concessions during bargaining.

## C. The Company's Interpretation of the CBA with the BMDA

The CBA between the Company and the BMDA provides that the Plan "shall remain in full force and effect in accordance with the provisions thereof, providing, however, that changes thereto may be made as provided in Article I of the [P]lan." The Unions concede that the CBA arguably incorporates the Plan documents. Article I of the Plan permits certain modifications to the Plan for tax purposes. Article XII of the Plan states that "[s]ubject to the applicable provisions of any collective bargaining agreement, the Company shall have the right to amend, modify, or suspend the Plan."

The Unions argue that the phrase "remain in full force and effect" requires that the Company maintain the status quo and make no changes. Not so. There is a sound arguable basis for the Company's determination that the agreement gives it the power to amend the Plan and requires bargaining only when it seeks to change the benefit structure or the level of benefits conferred, neither of which occurred here.

## D. The Board's Determination of No Bad Faith

We give deference to the Board's determination, as to all three contracts, that the Company did not act in bad faith. See NLRB v. Hearst Publ'ns, Inc., 322 U.S. 111, 131 (1944) ("[T]he

-27-

Board's determination . . . is to be accepted if it has 'warrant in the record' and a reasonable basis in law."), overruled in part on other grounds by Nationwide Mut. Ins. Co. v. Darden, 503 U.S. 318 (1992). We disagree with the analysis of the dissenting Member of the Board that bad faith is necessarily shown because the employer took the position, which is certainly arguable, that the contract permitted it to make this change unilaterally. See Bath Iron Works Corp., 345 N.L.R.B. No. 33, at 6, 10 (Liebman, Member, dissenting).

The Board's conclusion that the Company did not engage in an unfair labor practice because it acted in good faith pursuant to a sound arguable interpretation of the three contracts was reasonable. There was no evidence to the contrary.

The Company urges us to hold that it did not modify the contracts because it was given, clearly and unambiguously, the authority to change the Plan sponsor. Like the Board, we decline to go so far.

**V.**

For the reasons stated above, we affirm the Board's decision dismissing the complaint below.

**Affirmed**.

**"Concurring opinion follows"**

**LYNCH, Circuit Judge, concurring in the judgment.** I join in the judgment of the majority opinion. I do not join Part III.B or the associated discussions of the topic covered in that Part. I write to explain my different approach on those issues. Although the majority and I agree that this case is properly a § 8(d) contract modification case, we disagree as to what that implies about any separate § 8(a)(5) unilateral change claim. We agree that the § 8(d) contract modification claim was properly handled by the Board.

The peculiar difficulty created by this case is that the Board stated in its opinion that this was a § 8(d) case because the General Counsel had alleged only "unlawful modification of the contracts within the meaning of Section 8(d)." Bath Iron Works Corp., 345 N.L.R.B. No. 33, at 3. I agree with the majority that it is not a fair reading of the record to say that the General Counsel did not also plead a § 8(a)(5) failure to bargain claim.

Normally, if the Board has not directly addressed an issue, we would remand to get the Board's determination -- here, its determination, assuming both claims were raised, on whether this was a § 8(d) case or a § 8(a)(5) case. I agree with the majority's implicit conclusion that this would be a fruitless exercise. This case is old, as well, and needs resolution.

The majority handles this problem by deciding on its own what the law is on § 8(a)(5) claims to which an employer raises a

contractual defense.  It justifies its own review of the § 8(a)(5) issue on the ground that the Board has been inconsistent, and so, it says, the court is entitled to engage in de novo review.  Of course, the Board may, and often has, changed its positions -- it is permitted to do so provided it explains itself.  See Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Servs., 125 S. Ct. 2688, 2699-700 (2005) (stating that under Chevron, an agency should have flexibility to vary its interpretation of a statute over time).  I do not think that de novo review can be justified.  I also do not think there has been material inconsistency on the part of the Board.[11]  Nor do I think there is any need to get into a discussion

---

[11]  In describing a supposed inconsistency in the Board's treatment of § 8(a)(5) unilateral change claims, the majority compares § 8(a)(5) unilateral change cases, in which the Board has applied the clear and unmistakable waiver analysis, with a § 8(d) contract modification case, in which the Board applied the sound arguable basis analysis.  NCR Corp., which the majority cites in support of the proposition that "[a]t times, . . . the Board has determined, without much explanation, that the dispute was solely one of contract interpretation," was a § 8(d) contract modification case, identified as such, not a § 8(a)(5) unilateral change case.

In NCR Corp., the union did allege a § 8(a)(5) unilateral change violation, 271 N.L.R.B. 1212, 1213-14, but the ALJ explained that on the facts of the case, the proper claim was a § 8(d) contract modification claim, id. at 1217-18.  The ALJ then analyzed the claim as a § 8(d) contract modification claim (without applying the sound arguable basis test), id. at 1218-19, and, finding a violation, awarded remedies applicable to contract modification claims, id. at 1219.  The Board reversed the ALJ's decision on the merits, applying the sound arguable basis test and concluding that it "[did] not find that the [employer] failed to comply with Section 8(d)."  Id. at 1213.  The Board made no mention of the ALJ's determination that a § 8(d) contract modification claim was the appropriate claim on the facts of the case, and it affirmed the ALJ's rulings, findings, and conclusions that were consistent with its decision.  Id.

of § 8(a)(5) cases at all, since this is not one, or into the dispute between the D.C. Circuit and the Board over the treatment of certain § 8(a)(5) claims, much less take any position on the matter.

In my opinion, while the Board was wrong to say that no § 8(a)(5) claim had ever been pled (if that is in fact what the Board meant), that is immaterial. The Board is not bound by the theories pled by the General Counsel. In explaining at some length the categorical differences between § 8(d) contract modification cases and § 8(a)(5) unilateral change cases, the Board gave a sufficient justification for why this case is _properly_ characterized _only_ as a § 8(d) case. _See_ _Bath Iron Works Corp._, 345 N.L.R.B. No. 33, at 3. We are required under _Chevron_ to give deference to the policy choices inherent in that decision by the Board. _See_ _Chevron U.S.A., Inc._ v. _Natural Res. Def. Council, Inc._, 467 U.S. 837, 843 (1984).

The problem posed here is sui generis. It is regrettable that the Board did not acknowledge the nature of the claims before it and posed this dilemma for the courts.