# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| STATE OF DELAWARE, DEPARTMENT OF CORRECTION, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | C.A. No. 11926-VCL |
| CORRECTIONAL OFFICERS ASSOCIATION OF DELAWARE, | ) ) ) ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION

Date Submitted: September 2, 2016
Date Decided: November 18, 2016

Jason Staib, Aleine Porterfield, STATE OF DELAWARE, DEPARTMENT OF JUSTICE; *Counsel for State of Delaware, Department of Correction*.

Lance Geren, FREEDMAN AND LORRY, P.C.; *Counsel for Correctional Officers Association of Delaware*.

**LASTER, Vice Chancellor.**

The State of Delaware, Department of Correction (the "Department") brought this action to vacate an arbitration award dated November 29, 2015 (the "Award"). The arbitration concerned a grievance brought by the Correctional Officers Association of Delaware (the "Association") under its collective bargaining agreement with the Department (the "Agreement"). The grievance sought payment of an additional hour of paid time or compensatory time for each overtime hour that a member of the Association worked while state offices were closed due to severe weather on January 21 and 22, 2014. The grievance claimed that the Association's members are entitled to this payment under the Executive Branch's policy for employee compensation during a weather closure (the "Weather Policy"). The grievance contended that the Department's non-compliance with the Weather Policy breached Article 19.2 of the Agreement, which provides that "work rules, policies, orders and directives shall be interpreted and applied fairly to all employees." The Department disputed the grievance, claiming that the Weather Policy does not require equal time off for overtime, and even if it did, the Weather Policy does not fall within the ambit of Article 19.2.

The arbitrator found that the Weather Policy is an "order" and a "policy" within the meaning of Article 19.2 and therefore the grievance alleged an arbitrable violation of the Agreement. The arbitrator upheld the grievance. The arbitrator interpreted the Weather Policy as requiring equal time off for overtime and concluded that the Department's refusal to pay breached its duty to apply the Weather Policy "fairly." The Award ordered the Department to make all Association members whole by providing

them with equal time off for overtime worked during the weather closures on January 21 and 22, 2014.

In this action, the Department argues that the arbitrator's finding of arbitrability should be reviewed *de novo*, that the grievance is not arbitrable, and that the Award is unenforceable. The Association contends that the Award is valid in all respects. The parties have cross-moved for summary judgment.

This decision grants the Association's cross-motion for summary judgment and enforces the Award. The Agreement demonstrates a clear and unmistakable intent to empower the arbitrator to decide whether the grievance was substantively arbitrable. The arbitrator's finding of arbitrability was based on a rational interpretation of the Agreement, foreclosing further judicial review. The Award claimed its essence from the Agreement, and it does not violate state public policy.

## I. FACTUAL BACKGROUND

The facts are drawn from the documentary record presented by the parties for purposes of summary judgment. Where, as here, the parties have filed cross-motions for summary judgment and agreed that there are no disputed issues of material fact, "the Court shall deem the motion to be the equivalent of a stipulation for a decision on the merits based on the record submitted with the motion." Ct. Ch. R. 56(h).

### A. The Weather Policy

In 2005, personnel in the Human Resources Management function of the Office of Management and Budget (the "HR Division") drafted the current Weather Policy. In January 2006, then-Governor Ruth Ann Minner issued Executive Order 77, which

2

adopted the Weather Policy "as the policy to govern Executive Branch agencies during severe weather conditions and other emergencies." Exec. Order No. 77, 9 Del. Reg. 1269 (Jan. 3, 2006). The Weather Policy provides that "[i]n appropriate circumstances, the Governor shall issue an Order stating that, because of expected or existing conditions, certain employees (as designated in this policy) are excused from reporting to work." *Id.* at Ex. A. Those designated by their respective agency or department as "Non-essential Employees" are excused from work without pay. Those designated as "Essential Employees" are still required to report to work during the weather closure. The Weather Policy provides Essential Employees with additional compensation for working during a weather closure by giving them equal time off. *Id.* ¶¶ 7–8.

The parties agree that the Weather Policy provides employees with equal time off for regularly scheduled hours. They dispute whether employees are entitled to equal time off for overtime. This issue has been a subject of longstanding debate. The Weather Policy's immediate predecessor was an executive order issued by then-Governor Michael Castle in 1987. Exec. Order. No. 36 (Feb. 12, 1987) (repealed by Exec. Order No. 77, 9 Del. Reg. 1269). Governor Castle's executive order cited "ambiguity . . . concerning the use of overtime pay and compensatory time to compensate State employees who are required to work during an emergency." It clarified that employees were entitled to equal time off for regularly scheduled hours of work:

> 6. Essential Employees . . . who are required to work, are entitled to compensation at their regularly hourly rate plus equal time off for all hours worked during a normal work day and shift (7-1/2 or 8 hours, as applicable). All [E]ssential [E]mployees who work additional consecutive shifts shall be compensated for hours worked in excess of the normal shift

3

in accordance with existing rules and personnel policies governing overtime payment.

*Id.* ¶ 6.

When Governor Minner adopted the current Weather Policy, it muddied the waters. The current Weather Policy added a sentence that, on its face, grants employees equal time off for overtime as well. It then compounded matters by adding a new item that might be construed as limiting equal time off to normal state business hours. The current Weather Policy provides:

> 7. Essential [E]mployees . . . are entitled to compensation at their regular hourly rate plus equal time off for all hours worked during their regularly scheduled work hours or shift. All Essential [E]mployees who work additional hours shall be compensated in accordance with existing rules and policies governing overtime payment. *Employees covered by the Fair Labor Standards Act (FLSA) are compensated for overtime at time and a half and receive equal time off* while employees exempt from the FLSA are compensated at straight time rates and receive equal time off.
>
> 8. *During any specified time periods* when Essential [E]mployees are required to report to work and other State employees have been given approval by the Governor to not report to work (during normal state business hours of 8 a.m. to 4:30 p.m.), those who work will receive an additional hour of compensation for each hour worked.

Exec. Order 77, 9 Del. Reg. 1269 ¶¶ 7-8 (emphasis added). The italicized phrase in item 7 appears to grant "equal time off" for overtime. The italicized phrase in item 8, which refers to "any specified time periods," can be interpreted in two ways. It might refer to the time period specified by the Governor as the duration of the weather closure. Alternatively, it might refer to any period within normal state business hours, as suggested by the parenthetical.

4

The HR Division adopted the latter interpretation and continued the prior practice of not awarding equal time off for overtime. The HR Division provided a form memorandum for state agencies to distribute to their employees after a weather closure. Its standardized language limited equal time off to regular hours: "[Essential Employees] will be compensated with equal time off for all regularly scheduled hours [worked during the weather closure]." From 2006 to 2010, the Department used this form language in the memoranda that it distributed to Department employees after weather closures.

In 2010, the Statewide Labor Management Committee asked the HR Division to clarify whether state agencies were awarding equal time off for overtime. The HR Division's research revealed that they did not, consistent with the standardized language of the memorandum. The HR Division also confirmed that it did not interpret the Weather Policy as entitling employees to equal time off for overtime:

> The intent of item #7 was to clarify that Essential [E]mployees working greater than their normal shift during a [weather closure] would only receive hour for hour compensatory time for the normal shift and not for additional hours worked. Additional hours worked are handled in accordance with existing rules and regulations governing payment of overtime.

Dkt. 29, Ex. 6, Ex. A.

In 2011, the Department complicated matters by altering the language in the memorandum that the Department distributed to its employees after a weather closure. The new language stated that "[Essential Employees] will be compensated with equal time off for the hours specifically listed above [*i.e.* the duration of the weather closure]." This language suggested that Essential Employees also would receive equal time off for

5

any overtime they worked during the weather closure. The Department used this language in the memoranda it sent to employees following weather closures until at least March 2015. *See* Dkt. 28, Ex. K. Notwithstanding the revised language, the Department does not appear to have compensated any employees with equal time off for overtime. Dkt. 29, Ex. 3, ¶¶ 13-14.

## B.     The Agreement

The Department and the Association entered into the Agreement in November 2011. It was the parties' first formal collective bargaining agreement and followed nearly ten years of negotiations. To align the Agreement with the state's fiscal year, the parties entered into two successor agreements. First, they signed a contract covering the period from December 1, 2011 through June 30, 2012, which included only non-compensation terms. Second, they agreed to a three-year restated agreement that implemented all of the terms of the Agreement effective July 1, 2012. The only revised term in the restated agreement provided for annual wage increases of 2%. *See id.* at Ex. 9, art. 38.1.

The limited compensation terms in the Agreement reflect the restrictions on collective bargaining for state employees who are subject to Delaware's merit system (collectively, "State Merit Employees"). *See* 19 *Del. C.* § 1311A(a). The Merit Employee Relations Board promulgates rules governing many aspects of the employment of State Merit Employees. 19 Del. Admin. C. § 3001 (the "Merit Rules"). Chapter 4 of the Merit Rules provides for a uniform pay plan. *Id.* at § 3001-4.0. Notably, state law does contemplate that State Merit Employees will collectively bargain over certain aspects of compensation. 19 *Del. C.* § 1311A(a)(1). But in every year since 2008, the General

6

Assembly has passed an annual budget act that explicitly prohibited State Merit Employees from collectively bargaining over any subjects covered by Chapter 4 of the Merit Rules. *See, e.g.*, 80 Del. Laws ch. 79, § 14 (2015) (FY 2016 Final Operating Budget). Under the resulting framework, the Association could collectively bargain for wage increases, which are not dictated by the Merit Rules, but it could not negotiate many compensation provisions typically found in collective bargaining agreements, such as base wage rates, overtime standards, and shift differentials, all of which are addressed by Chapter 4 of the Merit Rules.

As required by state law, the Agreement contains a grievance procedure. *See* 19 *Del. C.* §1313(c). The Agreement defines a grievance as "any dispute concerning the application or interpretation of the terms of the [Agreement]." Dkt. 29, Ex. 9, art. 8.2.1. Employees have the right to bring individual grievances, and the Association may also bring a "System-Wide Grievance." *Id.* art. 8.6. If the parties are unable to resolve the grievance, the Association may submit the matter to arbitration. The only grievances that are not arbitrable are "grievances alleging a violation of the Merit Rules." *Id.* art. 8.7 ("Merit Rules Grievances"). This exclusion reflects state law, which provides that the grievance procedures contained in the Merit Rules are the exclusive remedy for violations of the Merit Rules. 29 *Del. C.* § 5943(a); *see* 19 Del. Admin. C. § 3001-19.0.

Under the Agreement, the arbitrator's decision is "final and binding on the parties." Dkt. 29, Ex. 9, art. 8.3.8. The arbitrator must apply the rules of the American Arbitration Association (the "AAA"). *Id.* art. 8.3.11. The Agreement limits the arbitrator's role to "the application and interpretation of the provisions of [the

7

Agreement]." *Id.* art. 8.3.8. The arbitrator may not modify the Agreement and is prohibited from "establish[ing] or chang[ing] any individual wage rate, wage schedule or the job content of any occupational specification." *Id.* art. 8.3.9.

Article 19 of the Agreement is titled "Working Conditions." Article 19.2 provides in its entirety: "Work rules, policies, orders, and directives shall be interpreted and applied fairly to all employees." The bargaining history behind the provision is unilluminating. The Department's chief negotiator has stated that "discussion of the content and the purpose of the Article was limited, and commanded relatively little of the parties' attention." Dkt. 29, Ex. 4, ¶ 11. But he avers that the parties only discussed the provision in the context of policies promulgated by the Department. *Id.*

C.     **The Grievance**

The Governor declared a weather closure from 12:00 pm on January 21, 2014 through 4:30 pm on January 22, 2014 (the "January Weather Closure"). Gordon Fletcher, a physical plant trades mechanic, was an Essential Employee scheduled to work for the Department from 7:00 am to 3:00 pm on both January 21 and January 22. Fletcher ended up working continuously from 7:00 am on January 21 through 3:00 pm on January 22. This resulted in sixteen hours of overtime for his work between 3:00 pm on January 21 and 7:00 am on January 22. In accordance with the Department's practice, Fletcher received eleven hours of equal time off, one for each of his regularly scheduled hours worked during the January Weather Closure: 12:00 pm to 3:00 pm on January 21, and 7:00 am to 3:00 pm on January 22. He did not receive equal time off for his sixteen hours of overtime.

Shortly after the January Weather Closure, Fletcher found the Weather Policy on the HR Division's website. He interpreted the Weather Policy as entitling him to equal time off for the overtime he worked during the January Weather Closure. He contacted the Department and requested this compensation. The Department referred the question to the HR Division. The HR Division reaffirmed its position that the Weather Policy does not grant employees equal time off for overtime and refused to grant Fletcher an additional sixteen hours of equal time off.

On February 4, 2014, the Association filed a System-Wide Grievance against the Department. The grievance alleged that the Department had not fairly interpreted and applied the Weather Policy, breaching Article 19.2 of the Agreement.

## D.    The Arbitration

The arbitrator held a hearing on September 11, 2015. The arbitrator accepted additional briefing from the parties, and the hearing was declared closed on November 2, 2015. On November 29, the arbitrator issued the Award. Dkt. 29, Ex. 1.

The Department contended before the arbitrator that the grievance was not arbitrable because it alleged a purported violation of the Weather Policy and not the Agreement. The Department argued that the words "policy" and "order" as used in Article 19.2 do not include the Weather Policy and Executive Order 77. The arbitrator rejected this argument, finding that "the language of Article 19.2 imposes no such limitation on the term 'order'" and that Executive Order 77 specifically refers to the Weather Policy as a "policy." *Id.* at 11-12. The arbitrator concluded that "the parties'

9

grievance and arbitration procedure . . . contemplates arbitration of the grievance here." *Id.* at 12.

On the merits, the arbitrator rejected the Department's construction of the Weather Policy. The arbitrator found that the plain language of the second sentence of item 7— "Employees covered by the Fair Labor Standards Act (FLSA) are compensated for overtime at time and a half and receive equal time off"—grants equal time off for overtime hours. *Id.* at 13. The arbitrator rejected the Department's argument that item 8 dictates a different conclusion. The arbitrator found that "any specified time periods" in item 8 "refers to the time period specified by the Governor for a severe weather event during which Essential Employees must report to work" and not normal state business hours. *Id.* at 14. The arbitrator concluded that "[b]ecause 'any specified time period[s]' is not restricted to regular business hours, it necessarily includes both regular shifts and overtime." *Id.* The arbitrator observed that this interpretation "is reinforced by the final clause [of item 8], which states that those who work will receive 'an additional hour of compensation for each hour worked.'" *Id.*

The arbitrator also rejected the Department's fallback argument that, even if it had misinterpreted the Weather Policy, it had not breached its obligation under Article 19.2 to interpret and apply that policy "fairly" because it had applied the Weather Policy in a uniform and consistent manner to all Essential Employees. The arbitrator found that "[a]ssuming that such a practice existed, however, it merely shows that [the Department] has not discriminated in its application of [the Weather Policy]." The arbitrator construed

10

"fairly" as requiring the Department to apply the Weather Policy in a manner consistent with its language.

The arbitrator concluded that the Department "improperly compensated Correctional Officers for the weather emergency on January 21 and 22, 2014." *Id.* at 15 The Award "direct[ed] that [the Department] make whole all adversely affected Correctional Officers." *Id.*

### E.    This Litigation

On January 22, 2016, the Department brought this action to vacate and stay enforcement of the Award. The Association counterclaimed to enforce the Award. After a brief period of discovery, both sides moved for summary judgment.

## II.    LEGAL ANALYSIS

Summary judgment may be granted when "there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." Ct. Ch. R. 56(c). A motion for summary judgment is "a common method for this court to determine whether to vacate or confirm an arbitrator's award." *TD Ameritade, Inc. v. McLaughlin, Piven, Vogel Sec. Inc.*, 953 A.2d 726, 730 (Del. Ch. 2008) (internal quotations and citations omitted).

### A.    Substantive Arbitrability

When a party invokes an arbitration provision, the court must decide whether an arbitrator or a court has authority to determine whether the dispute is arbitrable. *See DMS Properties–First, Inc. v. P.W. Scott Assocs., Inc.*, 748 A.2d 389, 392 (Del. 2000). Delaware law presumes that a court will decide substantive arbitrability "unless the

parties clearly and unmistakably provide otherwise." *James & Jackson, LLC v. Willie Gary LLC*, 906 A.2d 76, 78 (Del. 2006) (quoting *Howsam v. Dean Witter Reynolds, Inc.*, 537 U.S. 79, 83 (2002)). The Delaware Supreme Court held in *Willie Gary* that parties have demonstrated their clear and unmistakable intent to submit questions of substantive arbitrability to the arbitrator when the contract "generally provides for arbitration of all disputes and also incorporates a set of arbitration rules that empower arbitrators to decide arbitrability." *Id.* at 80.

There is no dispute here that the second prong of *Willie Gary* is met. The Agreement plainly provides that AAA rules govern the arbitration, and those rules state that the arbitrator determines substantive arbitrability. The fight is over the first prong. The Department contends that because the Agreement exempts Merit Rules Grievances from arbitration, it does not "generally provide for the arbitration of all disputes." Dkt. 29, at 28. Therefore, the Department contends that "something other than the incorporation of the AAA rules [is] needed to establish that the parties intended to submit arbitrability questions to an arbitrator." *Id.* at 29 (citing *Willie Gary*, 906 A.2d at 81).

Delaware courts have repeatedly rejected the Department's argument that, if an arbitration provision contains any exceptions, then the parties did not intend to empower the arbitrator to determine substantive arbitrability for all other contractual claims.[1] In

---

[1] *See, e.g.*, *Milton Inv., LLC v. Lockwood Bros., II, LLC*, 2010 WL 2836404, at \*7 (Del. Ch. July 20, 2016); *McLaughlin v. McCann*, 942 A.2d 616, 623 (Del. Ch. 2008) (Strine, V.C.); *BAYPO Ltd. P'ship v. Tech. JV, LP*, 940 A.2d 20, 26-27 (Del. Ch. 2007); *Carder v. Nutzz.com, LLC v. Vertrue Inc.*, 2006 WL 2220971, at \*6 (Del. Ch. July 25, 2006).

12

*McLaughlin v. McCann*, Chief Justice Strine, then serving as a Vice Chancellor, explained that the first prong of *Willie Gary* does not require "that an arbitration clause must refer all disputes to arbitration without exception." 942 A.2d at 623. Rather, the Chief Justice held that an arbitration clause will satisfy the first prong of *Willie Gary* so long as any exceptions are not "obviously broad and substantial." *Id.* at 625. He further observed that the court should defer to the arbitrator on substantive arbitrability if "there is any rational basis for doubt" about whether the contract meets the first prong of *Willie Gary*. *Id.* at 627.

Here, the Agreement commits to arbitration "any dispute concerning the application or interpretation of the [Agreement]." Dkt. 29, Ex. 9, art. 8.2.1. Without any exceptions, this language would satisfy the first prong of *Willie Gary*.[2] Merit Rules Grievances are the sole carve-out from this general language. This does not amount to an "obviously broad and substantial" exception. *McCann*, 942 A.2d at 625. The bulk of the Agreement concerns topics that are either not addressed by the Merit Rules[3] or areas

---

[2] 906 A.2d at 80. *Compare Orix LF, LP v. Inscap Asset Mgmt., LLC*, 2010 WL 1463404, at *7 (Del. Ch. Apr. 13, 2010) (Strine, V.C.) ("Delaware courts have found the use of both 'arising out of' and 'relating to' language in an arbitration provision to be a broad mandate."); *Milton*, 2010 WL 2836404, at *6 (holding that language referring to arbitration "all disputes involving or relating to … interpretation of Agreement" satisfies *Willie Gary*).

[3] *See, e.g.*, Dkt 29., Ex. 9, arts. 5 (union security), 6 (release time for union representatives during negotiations), 26 (drug testing), 32 (subcontracting).

where the Agreement trumps the Merit Rules under state law.[4] The exception for Merit Rule Grievances is a narrow carve-out to ensure that the Agreement does not circumvent the grievance procedure contained in the Merit Rules themselves, which state law makes exclusive. 29 *Del. C.* § 5943(a).

Accordingly, the Agreement provides for arbitration of all grievances except for Merit Rule Grievances. The court's role, then, is limited to determining whether the grievance in this case was a Merit Rules Grievance. *Nutzz.com*, 2006 WL 2220971, at *6. If not, then *Willie Gary* applies, and the arbitrator was empowered to decide the issue of substantive arbitrability.

It does not appear that the Department argued to the arbitrator that the grievance was a Merit Rules Grievance. On its face, the grievance did not "alleg[e] a violation of the Merit Rules." Dkt. 29, Ex. 9, art. 8.7. It alleged a violation of the Weather Policy, which in turn violated Article 19.2 of the Agreement. The Weather Policy is a standalone employment policy that has never been adopted by the Merit Employee Relations Board as part of the Merit Rules. *See* 29 *Del. C.* § 5914 (outlining procedure for additions to the Merit Rules). Its legal authority comes not from the Merit Rules, but from Executive Order 77. *See AFSCME, Local 2004 v. Dep't of Servs. for Children, Youth, and their*

---

[4] *See* 29 *Del. C.* §5938(d) (outlining various sections where provisions in collective bargaining agreements control over the Merit Rules, including probationary periods, transfers, grievances, scheduling, and layoffs). *Compare* Dkt. 29, Ex. 9, arts. 7 (probationary period), 9-10 (employee discipline), 17 (seniority), 21 & 23 (scheduling), 24 (transfers), 34 (layoffs).

*Families*, 696 A.2d 387, 390 (Del. 1997) (treating an executive order as a binding limitation on Executive Branch employment practices).

Although the Department did not argue the point to the arbitrator, in this action the Department's core contention is that this grievance is a disguised Merit Rules Grievance. While acknowledging that the grievance did not technically allege a violation of the Merit Rules, the Department claims that it was "in substance . . . about the proper pay standard for overtime worked during a[] [weather closure]." Dkt. 29, at 31. This subject, the Department claims, is covered by Merit Rule 4.13, which provides a "universal standard for overtime pay." *Id.* at 31–32. The Department contends that, in seeking equal time off for overtime worked during a weather closure, the grievance amounted to "a request for a modification of the Merit Rule's universal standard for overtime compensation based on the Association's erroneous interpretation of the [Weather Policy]." *Id.* at 32.

The Department reasons that the Association's interpretation of the Weather Policy necessarily modifies the overtime standards by providing additional pay during time that qualifies for overtime. But this does not follow. Overtime is "additional compensation for work performed in excess of the standard work week." *Laborers' Int'l Union of N. Am., Local 1029 v. State Dep't of Health and Social Servs.*, 310 A.2d 664, 668 (Del. Ch. 1973). While working overtime, employees may remain eligible for other wage premiums that are triggered by different events other than the number of hours worked. One apt example is holiday pay, which is closely analogous to the Weather Policy. *See Int'l Ass'n of Firefighters, Local 1590 v. City of Wilm.*, 2015 WL 2358627

15

(Del. Ch. May 15, 2015) ("It is generally accepted that employers compensate employees for holidays by either given them the day off with pay or pay them extra for working—colloquially, 'the pay for the day.'").

Depending on the policy for holiday pay, employees may receive holiday pay during only regularly scheduled hours, or for some or all of overtime. *See id.* at 1–3 (comparing Wilmington law granting city employees double pay for all hours worked during a Mayor-declared weather closure with the city's collective bargaining agreement with city firefighters capping such pay at 16 hours for each shift). If they do receive holiday pay for overtime, it does not "modify" the overtime standard. It simply extends an additional wage premium to overtime hours. The employee's eligibility for the wage premium accompanying overtime remains determined by the overtime policy and applicable law.

The equal time off provided by the Weather Policy is similarly a distinct wage premium. Like holiday pay, it applies when an employee works during a period when other employees are excused from work with pay. This premium bears no relationship to overtime, which applies based on the number of hours an employee works in a given period. Accordingly, the Weather Policy alone, not the overtime provisions of Merit Rule 4.13, determines whether equal time off under the Weather Policy includes overtime. It does not modify Merit Rule 4.13's standards for overtime eligibility.

The grievance was what it purported to be: an allegation that the Department has misapplied the Weather Policy and thereby breached its obligation under Article 19.2 of the Agreement to fairly interpret and apply that policy. The Association's interpretation

16

of the Weather Policy does not modify the overtime standards in Merit Rule 4.13 or any other compensation standard contained in the Merit Rules. The grievance was not a Merit Rules Grievance. Whether it was arbitrable was for the arbitrator to decide. *Willie Gary*, 906 A.2d at 80.

## B. The Merits of the Arbitrator's Ruling

"[R]eview of an arbitration award is one of the narrowest standards of judicial review in all of American jurisprudence." *SPX Corp. v. Garda USA, Inc.*, 94 A.3d 745, 750 (Del. 2013) (internal quotations and citations omitted). Delaware courts "will not disturb a labor arbitration award unless (a) the integrity of the arbitration has been compromised by, for example, fraud, procedural irregularity, or a specific command of law; (b) the award does not claim its essence from the [collective bargaining agreement]; or (c) the award violates a clearly defined public policy." *Meade v. Wilm. Hous. Auth.*, 2003 WL 939863, at \*4 (Del. Ch. Mar. 6, 2003). An arbitration award does not claim its essence from the collective bargaining agreement only if it "bears no reasonable relationship to the underlying contract from which it is derived." *Id.* "If there is any rational construction of the [collective bargaining agreement] that would support the arbitrator's award, the award must be upheld." *Id.* Where, as here, the court has found that the parties committed the issue of substantive arbitrability to the arbitrator, the arbitrator's determination of this issue is subject to the same narrow standard of review. *First Options of Chicago v. Kaplan*, 514 U.S. 938, 943 (1995).

In this action, the Department does not contest the arbitrator's construction of the Weather Policy. It rather challenges the arbitrator's conclusion that the grievance was

17

arbitrable. It first contends that the arbitrator erred in construing the terms "policies" and "orders" in Article 19.2 to encompass the Weather Policy. The Department claims that Article 19.2 was intended only to include policies and orders issued by the Department and not statewide compensation policies that the Department applies. Dkt. 29, at 48. The Department argues that the bargaining history supports this construction, claiming that "the only reason offered by [the Association] for including this Article was to ensure that [the Department's] comprehensive body of policies would be applied consistently." *Id.* at Ex. 4, ¶ 11. The Department also finds textual support for its argument in the heading of Article 19, "Working Conditions." The Department claims that this is "a term of art that connotes workplace safety. It does not encompass wages, salaries, or other forms of employee compensation." *Id.* at 48. For this proposition, the Department relied on *Corning Glass Works v. Brennan*, 417 U.S. 188, 202 (1974).

As noted by the arbitrator, the plain language of Article 19.2 contains no limitation on the "orders" and "policies" that the Department must apply fairly. "When no ambiguity is present in a contractual provision, the court will not resort to extrinsic evidence in order to aid in interpretation, but will enforce the contract in accordance with the plain meaning of its terms." *Wilm. Firefighters Ass'n v. City of Wilm.*, 2002 WL 418032, at \*7 (Del. Ch. Oct. 17, 2007) (Strine, V.C.) (citing *City Investing Co. Liquid. Trust v. Cont'l Cas. Co.*, 624 A.2d 1191, 1198 (Del. 1993)). The arbitrator here reasonably found that the plain language of Article 19.2 unambiguously included the Weather Policy. He had no obligation to consider the bargaining history offered by the Department.

Nor does the heading of Article 19 mandate a different interpretation of the text. While contract headings may be evidence of meaning, they are not conclusive. *Cantor Fitzgerald, L.P. v. Cantor*, 724 A.2d 571, 581 n.35 (Del. Ch. 1998). Moreover, "working conditions" has been interpreted more broadly than the *Corning* decision construed that term under the Equal Pay Act.[5] Limited Delaware authority suggests that the term can take on a broader meaning when used in a collective bargaining agreement. *See Bd. of Educ. of Sussex Cnty. Vocational Tech. Sch. Dist. v. Sussex Cnty. Vo-Tech Teachers' Ass'n*, 1995 WL 1799135, at *2 (Del. Ch. June 28, 1995) (upholding arbitrator's finding of arbitrability on the grounds that "working conditions," as used in the parties' collective bargaining agreement, "may be broadly interpreted to include the right to bump"). As "working conditions" lacks precise meaning, its use as a heading in the Agreement does not mandate the Department's narrow interpretation of Article 19.2.

The Department next contends that the Award "amended the [Agreement] to include a compensation standard that was not negotiated." Dkt. 29, at 44. The Department claims that this result cannot claim its essence from the Agreement because its grievance provisions prohibit the arbitrator from modify[ing] . . . the terms of the Agreement" or "establish[ing] or chang[ing] any individual wage rate." *Id.* at Ex. 9, art. 8.3.9. This misapprehends the Award. The arbitrator did not create a contractual right to

---

[5] *See, e.g.*, *Indep. Fed. of Flight Attendants v. Trans World Airlines*, 655 F.2d 155, 157 (8th Cir. 1984) (observing that "the term 'working conditions' is to be broadly interpreted" as used in the Railway Labor Act); *Jurva v. Attorney Gen. of Mich.*, 351 N.W.2d 813, 819 (Mich. 1984) (finding that "working conditions" as used in a state statute includes fringe benefits).

receive equal time off for overtime, as if such a term were collectively bargained. Rather, he found that the Department was obligated to follow the terms of the current Weather Policy, which he construed as providing employees with equal time off for overtime. The Association's members are accordingly only entitled to this benefit so long as the current Weather Policy remains in effect. The Award does nothing to prevent the Executive Branch from changing the Weather Policy to exclude overtime.[6]

A similar flaw undermines the Department's argument that the Award cannot claims its essence from the Agreement because "overtime and other forms of premium pay beyond base wage rates" are compensation matters determined by the Merit Rules, which may not be collectively bargained under state law. Dkt. 29, at 43. This decision has already rejected the argument that the Weather Policy implicates the overtime standards contained in the Merit Rules. The Department has not identified any other Merit Rules' provision that addresses the premium awarded by the Weather Policy. Even assuming that compensation during a weather closure may not be collectively bargained, the Award

---

[6] *See, e.g.*, *Armstrong Cnty. Mem'l Hosp. v. United Steel, Paper and Forestry, Rubber, Mfg., Energy, Allied Indus. & Serv. Workers Int'l Union*, 419 Fed. App'x 217, 222 (3d. Cir. 2011) (holding that an employer's contractual right to "make or change reasonable Employer rules, regulations, policies, and practice" gives the employer unilateral right to change smoking policy, and vacating arbitrator award imposing additional limitations); *CP Kelco US, Inc. v. Int'l Union of Operating Eng'rs*, 381 Fed. App'x 808, 814–15 (10th Cir. 2010) (holding that the employer retained right to unilaterally change call-in policy under management rights provision, and vacating arbitrator's award imposing additional limitations); *Enloe Med. Ctr. v. NLRB*, 433 F.3d 834, 838–39 (D.C. Cir. 2006) (holding that contractual provision allowing employer to adopt or change policies during course of agreement permitted employer to unilaterally change on-call policy).

does not recognize the Association's authority to do so. Rather, it recognizes the Association's authority to hold the Department to the letter of its own employment policies. The Award plausibly found this authority in Article 19.2's requirement that "work rules, orders, policies, and directives shall be interpreted and applied fairly." *Id.* at Ex. 9, art. 19.2.

Finally, the Department argues that the Award is contrary to Delaware's public policy. "The public policy exception is narrow." *City of Wilm. v. AFSCME Local 1102*, 2003 WL 1530503, at *5 (Del. Ch. Mar. 21, 2003) (quoting *E. Ass'n Coal Corp. v. UMW*, 531 U.S. 57, 63 (2000)). "The public policy must be explicit, well-defined, and dominant." *Id.* (internal citation and quotations omitted). The parties have not identified, and the court is not aware of, any Delaware case vacating an arbitrator's award under the public policy exception. Here, the Department contends that the Award results in only the Association's members receiving equal time off for overtime, which "no other [Essential Employee] has received, ever." Dkt. 29, at 5. The Department argues that this violates the "fundamental precept of the Merit System" that State Merit Employees be treated uniformly. *Id.*

The precept is not as fundamental as the Department represents. Delaware's policy of uniformity for State Merit Employees is significantly qualified by the countervailing policy favoring collective bargaining rights for public employees.[7] Not only does this

---

[7] Section 1301 of Title 19 states:

policy contemplate resolution of grievances by a binding grievance-arbitration procedure,[8] but the process of collective bargaining will necessarily result in some differences between groups of State Merit Employees. Delaware courts have noted the difficulty of reconciling collective bargaining and the merit system.[9] The Department itself characterizes the interaction as "fairly complex." Dkt. 29, at 39. The Delaware Code contemplates areas where bargaining units may negotiate different terms from other

---

> It is the declared policy of the state and the purpose of this chapter to promote harmonious and cooperative relationships between public employers and their employees and to protect the public by assuring the orderly and uninterrupted operations and function of the public employer. These policies are best effectuated by:
>
> (1) Granting to public employees the right of organization and representation;
>
> (2) Obligating public employers and public employee organizations which have been certified as representing their public employees to enter into collective bargaining negotiations with the willingness to resolve disputes relating to terms and conditions of employment and to reduce to writing any agreements reached through such negotiations.

19 *Del. C.* § 1301.

[8] *See* 19 Del. C. § 1313(c) (mandating that public employers and unions negotiate grievance procedures "by means of which bargaining unit employees . . . may appeal the interpretation or application of any term or terms of an existing collective bargaining agreement.").

[9] *See, e.g.*, *AFSCME, Local 2004*, 696 A.2d at 389 (describing interaction of merit system with state collective bargaining rights as "somewhat complex"); *Del. Nurses Ass'n v. Del., Dep't of Health & Soc. Servs.*, 1984 WL 484508, at *1 (Del. Super. Jul. 30, 1984) (noting that Delaware legislature's attempts to reconcile these statutory provisions "has proved less than comprehensive"); *Laborers' Int'l Union of N. Am., Local 1029*, 310 A.2d at 666 (noting that much of Delaware's merit system "inevitably conflict[s] with the scope of collective bargaining authorized under state law.").

22

groups of State Merit Employees. *See* 19 *Del. C.* § 1311A(a). Whatever the "dominant" public policy is in this area, it demands something less than perfectly uniform treatment among State Merit Employees.

This decision need not determine the precise bounds of the public policy, for the Award stays within them. The Award gives equal time off for one event to a limited class of State Merit Employees: Association members that were designated as Essential Employees and worked overtime during the January Weather Closure. Claims for previous events are time-barred under the Agreement. *See* Dkt. 29, Ex. 9, arts. 8.3.2, 8.5 (individual and System-Wide Grievances must be filed either within 14 days of the event giving rise to the grievance or 14 days that the grievant could reasonably be expected to have knowledge of those events). It is also within the Executive Branch's power to prevent further disparities resulting from the Award. The Executive Branch may (i) pay all Essential Employees equal time off for overtime, (ii) amend the Weather Policy to foreclose equal time off for overtime, or (iii) negotiate an amended version of Article 19.2 of the Agreement that excludes the Weather Policy. Under these circumstances, the Award creates only a *de minimis* deviation in compensation. This is insufficient to undermine a Delaware public policy concerning uniform treatment of State Merit Employees.

## III.    CONCLUSION

The Department's cross-motion for summary judgment on its claim to vacate the Award is denied. The Association's cross-motion for summary judgment on its claim to enforce the Award is granted.

23